[Opinion delivered March 17, 1886.]

[No. 2035.]

## James Hunnicutt *v*. The State.

1. Practice — Change of Venue.— In a felony case the defendant applied for a change of the venue on the ground that on account of prejudice he could not get an impartial trial in the county of the forum, and his application was supported by the affidavits of twelve compurgators. The State filed the counter-affidavit of the sheriff of the county, directly controverting the application, and attacking the means of knowledge of the twelve compurgators by alleging that it was "confined to their particular neighborhoods, which do not include the whole county, and that their means of knowledge is besides limited, they not being acquainted with the sentiments of the

people" of the county on the subject. His counter-affidavit expressly denied the alleged prejudice and asserted that the defendant could get an impartial trial in the county. To the sufficiency of this counter-affidavit the defense excepted on the ground that it affirmed the mere conclusions of the sheriff, and not matters of fact, and also on the ground that the sheriff of the county is "not the kind of person who in law is intended to make the counter-affidavit." The trial court overruled the exceptions, heard evidence on the issue, and refused to change the venue of the cause; to which the defense reserved exception. *Held,* that the exceptions to the counter-affidavit were properly overruled, and no error in the rulings and action of the trial court is apparent.

2. DYING DECLARATIONS — PREDICATE — PRACTICE.— In a trial for murder the State proposed to put in evidence certain dying declarations of the deceased, and (the jury being retired) laid a sufficient predicate by a witness who swore that the deceased said he was dying. The defense proposed to disprove this statement of the State's witness, and to prove that the deceased did not say he was dying. The trial court refused to hear this proof offered by the defense, and held that it was not admissible on the investigation of the predicate, but would be admitted before the jury on the trial in chief, as evidence tending to impeach the credibility of the State's witness. *Held,* that the ruling of the trial court was correct.

3. DYING DECLARATIONS — EVIDENCE.— It was in proof that the deceased, after he was shot, said that he was killed, but that in his great agony he persistently asked a physician to " do something for him." The defense contended that this showed hope of recovery, and thereby disqualified as evidence the deceased's further declaration that it was the defendant who shot him. But *held* that the appeal of the deceased for relief did not prove that he entertained hope of recovery, and therefore the trial court correctly admitted testimony of the deceased's further declaration as to the person who shot him.

4. PARDON.— To the competency of a State's witness the defense objected and proved by the record that he had been convicted of a felony, to wit, the theft of a steer, at the June term, 1878, of the trial court. The State, to obviate the objection, offered a charter of pardon which described the felony as "cow-stealing," and dated the conviction as of the September term, 1878. The defense objected to the pardon on the ground that it was for a different offense than that of which the witness had been convicted. The trial court, over defendant's objection, heard proof by the record, the clerk of the court, and the witness himself, showing that the latter had never been convicted in the court but the one time disclosed by the record evidence introduced by the defense. The trial court sustained the sufficiency of the pardon in spite of the discrepancies between it and the record of conviction, and held the witness competent to testify. *Held,* that the ruling was correct.

5. MURDER — EVIDENCE — PRACTICE.— To impugn the competency of the same witness for the State, and in support of a motion to have his testimony withdrawn from the jury, the defense relied upon the witness's own admissions that on the day after the homicide he testified before the grand jury and a justice's inquest that he himself killed the deceased, and that, being imprisoned therefor, two members of the grand jury came to the jail and told him he would be released if he would change his testimony and swear that the deceased was not killed by him but by the appellant,— which was the truth according to the witness's present testimony. The witness stated

that he did change his testimony before the grand jury in accordance with the suggestion of the two grand jurors, and was released from custody. The defense insisted that this showed the witness to have been bribed and thereby incapacitated to testify. The trial court ruled that these matters went to the credibility and not the competency of the witness; and this ruling is *held* correct.

6. SAME — IS THE STATE BOUND TO INTRODUCE ALL ATTAINABLE EYE-WITNESSES OF THE RES GESTÆ? In support of the affirmative of this question consult the opinion of the court for the individual views of White, presiding judge; and in maintenance of the negative see the reasons assigned by Hurt, judge, in his dissenting opinion. (The views of Willson, judge, upon this question are not disclosed.)

7. MURDER — SELF-DEFENSE.— Article 574 of the Penal Code, in express terms and without qualification or condition, justifies homicide committed for the protection of the slayer's person against an attack which "produces a reasonable expectation or fear of death or some serious bodily injury." This is a substantive and independent provision of the Code, entirely consistent with the preceding articles 570 and 572, and there is no legal warrant to engraft upon it the requirement or condition of article 572, that "other means" for the prevention of the injury must be resorted to before the slayer is justifiable in killing his assailant. If, therefore, in a trial for culpable homicide, there be evidence tending to prove that the homicide was committed for the protection of the person of the slayer against an attack by the deceased which produced a reasonable expectation or fear of "serious bodily injury" to the slayer, it was error to instruct the jury to convict, unless the slayer, before killing the deceased, resorted to other means for the prevention of the injury. (Hurt, judge, dissents from this ruling.)

8. SAME.— Hurt, judge, dissenting from the last preceding ruling, maintains that the slayer is not justified in killing his assailant before resorting to other means of preventing the injury, unless it reasonably appears that the intention of the person killed was to commit one of the specific offenses enumerated in article 570 of the Penal Code,— to wit, murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, and theft at night; and that article 574, relied upon by the majority of the court, should be construed in connection with and subordination to article 572; and therefore, if the unlawful and violent attack be such as only produces a reasonable expectation or fear of serious bodily injury, the slayer, before killing his assailant, must resort to other means of prevention, and must kill while his assailant is in the very act of making the unlawful and violent attack, as required by said article 572. See the dissenting opinion *in extenso* on the subject.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

Beginning on page 448 of the eighteenth volume of these Reports will be found the report of this case on a former appeal to this court, the conviction upon that trial being for murder of the first degree, supplemented with a life term in the penitentiary as punishment. Upon the same indictment which charged him with the murder of F. E. Umphress, in Dallas county, Texas, on the 16th day of June, 1884, the appellant upon this subsequent trial was convicted in the

second degree, and his punishment was assessed at confinement in the penitentiary for the term of twenty years.

Joseph Polser was the first witness introduced by the State. The defense objected to the competency of the proposed witness to testify upon the ground that he had been convicted of an infamous crime and sentenced to a term of imprisonment in the State penitentiary, and in support of the objection introduced in evidence the minutes of the district court of Dallas county, Texas, from which it appeared that, on the 6th day of September, 1878, the said Joseph Polser was tried upon an indictment charging him with the theft of a steer, was convicted and awarded a term of two years in the penitentiary as punishment. From the same minutes it was made to appear that on the 11th day of October, 1878, the said Polser's motion and amended motion for a new trial were overruled by the trial court, and sentence was passed in accordance with the verdict, but was suspended, the said Polser being remanded to the custody of the sheriff, to await the action of the court of appeals upon his appeal from the judgment of conviction. It was further shown by the said minutes that the trial court, on the 26th day of June, 1879, reciting the filing of the mandate of the court of appeals, affirming the judgment in the trial court, passed final sentence upon the said Polser, consigning him to confinement in the penitentiary for the term of two years in accordance with the verdict of the jury.

To meet this objection the State introduced in evidence the following

### "PROCLAMATION!

#### "BY THE GOVERNOR OF THE STATE OF TEXAS.

" *To all to whom these presents shall come:*

"Whereas, at the September term, A. D. 1878, in the district court of Dallas county, State of Texas, Joe Polser was convicted of cow stealing and sentenced to the penitentiary for two (2) years, Now, therefore, I, John Ireland, Governor of Texas, do by virtue of the authority vested in me by the Constitution and laws of this State, hereby, for the reasons specified now on file in the office of the Secretary of State, grant to the said convict pardon, the same being to restore his citizenship, he having served out his term.

"In testimony whereof, I have hereto signed my name, and caused the seal of State to be affixed, at the city of Austin, this 29th day of April, A. D. 1885.

"By the Governor:                    JOHN IRELAND,
          "J. W. BAINES,                         Governor of Texas.
                    "Secretary of State."

The defendant's fifteenth bill of exception states the objection to the charter of pardon to be that it does not describe the offense of which Polser was convicted; that the pardon describes the conviction to have been for "cow stealing," and to have been obtained by the State at the September term, 1878, whereas the conviction was for the theft of a steer, and was obtained at the June term, 1878. The same bill of exceptions complained that the State was permitted to show by the records that the June term, 1878, of the district court of Dallas county began in June and closed in November, and that Polser was convicted in September of that term; further, that the State was permitted to prove by the district clerk of Dallas county that there had never been but the one felony conviction of the proposed witness Polser, in the district court of Dallas county, and further, that the State was permitted to ask Polser if he had been confined in the penitentiary upon more than one felony conviction, and Polser was permitted to reply that he had not. Thereupon the court held the charter of pardon sufficient, the examination of Polser was resumed, and he testified substantially as he did on the former trial of this case.

Of the witnesses who testified for the State on the former trial, Messrs. Minton, Tooley, Gliser, Maddox and Lanham testified upon this trial for the State, and in substance the same as they testified upon the former trial. In addition to the witnesses named, the State introduced upon this trial but two witnesses, Charley Carter and Sam Lazee.

Carter testified, in substance, that he had gone to bed in his room up-stairs over his father's saloon, situated opposite the Stock Yard's Saloon, when the fatal shot was fired. The shot was followed by a cry of distress on the street. Looking out at his window he saw a man mount a grey horse just south of the side door of the Stock Yard's Saloon, and ride off rapidly, south, and towards Main street. The man who was shot went into Hurlbut's hotel.

Lazee testified, for the State, that he was working at the restaurant adjoining the Stock Yard Saloon at the time of the killing. Witness saw deceased and Joe Polser quarreling in front of the saloon late that night. George Herndon, Ike Hunnicutt and George Waller were present. Herndon waived his hand to deceased to get back. Witness went back into the restaurant to wait on a customer, and, while thus engaged, heard the fatal shot. About fifteen minutes had elapsed between the quarrel spoken of and the pistol shot. Witness did not see defendant in the saloon while deceased and Polser were quarreling. He saw defendant about the saloon at a previous hour of the night. The State closed.

The defendant introduced a number of witnesses who testified that the deceased was a quarrelsome, fighting man, when drunk, but they could not affirm that he was a dangerous man. Other witnesses testified that, when in liquor, the deceased was not only quarrelsome, but dangerous. Other witnesses for the defense testified that the reputation of the State's witness Polser for truth and veracity was bad.

The motion for new trial raised the questions discussed in the opinion.

*R. B. Seay* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. This is the second appeal taken in this case, the first being from a conviction for murder of the first degree, with a life term in the penitentiary assessed as the punishment (*Hunnicutt* v. *The State*, 18 Texas Ct. App., 498); this present being from a conviction for murder of the second degree, with the punishment affixed at twenty years in the penitentiary.

Many questions of an interesting character are presented in the record, but we propose to discuss only such as may become important upon another trial, remarking in passing that such as are not discussed are not considered as presenting errors of a radical or reversible character.

1. Defendant applied for a change of venue on account of the existence of such prejudice against him that he could not get a fair and impartial trial in the county where the prosecution originated and was pending; this being one of the statutory grounds provided for in article 578, Code of Criminal Procedure. Twelve compurgators supported defendant's affidavit as to the existence and character of the prejudice against him. W. H. W. Smith, the sheriff of Dallas county, made a counter-affidavit, directly controverting and attacking the means of knowledge of defendant's compurgators with reference to the matter stated in the application, and expressly denying the existence of such prejudice against defendant as that he could not obtain a fair and impartial trial in Dallas county. This counter-affidavit was sufficient under the statute to attack the means of knowledge of the compurgators and to raise and present the issue of "prejudice" or "no prejudice," so as to authorize the introduction of evidence on the issue in order that it might be tried and determined by the court. (Code Crim. Proc., art. 583; *Davis* v. *The*

*State*, 19 Texas Ct. App., 201; *Pierson* v. *The State*, decided at the present term. It was not error to overrule exceptions made to the sufficiency of said counter, attacking affidavit, nor was it error to overrule the application for a change of venue.

2. As to dying declarations, a sufficient predicate was laid by both the witnesses Gliser and Tooley for their admission in evidence. When the admissibility of Gliser's evidence of dying declarations (the jury having been retired) was being inquired into by the court, and after the witness had stated the circumstances attending the making of, and what these declarations were, defendant's counsel proposed to disprove the statements made by said witness by other witnesses, and the court held that such proof was not permissible at that time, but could be made by way of impeachment of the witness before the jury. We are of opinion that the court did not err, but on the contrary announced the proper practice. If a proper statutory predicate was laid by the witness (Code Crim. Proc., art. 748), it was the duty of the court to admit the evidence. As to the credibility of the witness testifying to the declarations, that was a matter exclusively within the province of the jury, and the court would not have been authorized to have ruled out evidence otherwise admissible, upon the ground that the witness was not worthy of credit.

Nor was it error to admit the evidence of the witness Maddox in this connection. The fact that the wounded man was continually asking the doctor "to do something for him," does not controvert his belief of the statement he first made to the witness Tooley,— "Oh, my God, Mr. Tooley, I am killed,"— or the fact that he was conscious of his dying condition; but to our minds it only evidences a desire to have the doctor do what he could to alleviate his sufferings. Intensity of pain frequently prompts those conscious that they must die to request others to kill them to relieve them of their sufferings, and in extremity of physical suffering it is but natural that such an one should desire all the palliation or relief possible, though he may know that death is inevitable in a short time. Deceased had stated that he was dying,— was killed,— before Maddox was present, and the fact that Maddox heard no such statements after he arrived is no evidence that a change had taken place in the deceased's mind as to his hopes of recovery.

3. Objection was made to the pardon offered in connection with the witness Polser, who was an ex-convict. Two objections were urged: 1st. That the pardon misrecited the offense for which the witness had been convicted and served a term in the penitentiary;

and 2d, that there was a variance between the date of the conviction and that stated in the pardon. The witness had been convicted at the June term, 1878, of the district court of Dallas county, of "theft of a steer." The pardon was for a conviction for "cow stealing" at the September term, 1878, of the district court. Whilst it has been held that if a pardon misrecites the offense, that would render it inoperative (1 Whart. Crim. L. (5th ed.), § 766, and note; *Hunnicutt* v. *The State*, 18 Texas Ct. App., 521), we cannot say that the offense is misrecited in this instance. In common parlance and acceptation we cannot but say that "theft of a steer" is not embraced in the general charge of "cow stealing." It was shown by proof that the witness had never been but once convicted and sentenced to the penitentiary in the district court of Dallas county. "The rule is, in the absence of fraud, a pardon will be good though it states the date of the conviction incorrectly, if it was intended to cover and does cover the particular offense." (1 Bishop's Crim. L., § 906; *Hunnicutt* v. *The State*, 18 Texas Ct. App., 521.) Under the facts as shown, we are of opinion the pardon was valid and restored the competency of the witness.

4. Objection was further made to the competency of the witness Polser, and a motion was made to withdraw and exclude his testimony from the jury, because this witness had, on the day after the homicide, stated before the grand jury that he himself had committed the homicide, and that, after he had been placed in jail for the killing, two members of the grand jury told him that if he would change his testimony and state that he did not do the killing, he would be turned loose,— whereupon he, Polser, again went before the grand jury and testified that he did not do the killing but that defendant Hunnicutt did. Wherefore it was insisted that the witness was a bribed witness, and that his testimony should have been excluded from the jury. The matters stated are such as should have been submitted to the jury as affecting the credibility of the witness; they were not properly addressed to the court either as to the competency of the witness or the admissibility of the evidence. Having received a valid pardon, as above shown, the facts complained of did not render him incompetent to testify under any of the conditions named in the statute (Code Crim. Proc., art. 730), and it was for the jury alone to pass upon the credibility of the witness and the weight of his testimony.

5. After the State had closed its testimony the defendant moved the court to require the State to introduce as witnesses three other parties who were shown to have been present at and eye-witnesses

to the shooting,— to wit, George Waller, John Herndon and Ike Hunnicutt, and it was urged as ground for the motion that the only eye-witness of the transaction called to testify by the prosecution was the witness Polser, who was an ex-convict, who had admitted that he himself had done the killing, and who afterwards had agreed to testify otherwise under a contract of immunity. Upon this point the writer, in what follows, expresses alone his individual views.

In his work on Criminal Pleading and Practice, Mr. Wharton says, "the prosecution is not at liberty to put in part of the evidence making out its case and then rest. It is bound, under ordinary circumstances and when this can be done without undue cumulation of testimony, to call the witnesses present at the commission of the act which is the subject of the indictment." (Whart. Crim. Pl. & Prac. (8th ed.), § 565.) In his work on criminal evidence, the same learned author says: "The prosecution is usually bound to call all the attainable witnesses to a transaction which is the subject of examination. Thus, on a trial for murder where the widow and daughter of the deceased were present at the time when the fatal blow was supposed to have been given, and the widow was examined on the part of the prosecution, Patteson, J., directed the daughter to be called also, although her name was not on the indictment, and she had been brought to the assizes by the other side. 'Every witness,' he said, who was present at a transaction of this sort ought to be called; and even if they give different accounts it is fit that the jury should hear the evidence so as to draw their own conclusion as to the real truth of the matter." (Whart.'s Crim. Evid. (8th ed.), § 448.) The body of this text is taken from the rules announced in Roscoe's Cr. Evid. (7th ed.), p. 135.

In *Hurd* v. *The People*, 25 Mich., 405, it is said, "the prosecution in a criminal case is not at liberty, like a plaintiff in a civil case, to select out a part of an entire transaction which makes against a defendant, and then put the defendant to proof of the other part, so long as it appears at all probable from the evidence that there may be any other part of the transaction undisclosed, especially if it appears to the court that the evidence of the other portion is attainable. . . . The English rule goes so far as to require the prosecutor to produce all present at the transaction, though they may be near relatives of the prisoner. Doubtless where the number present is very great, the production of a part of them might be dispensed with after so many had been sworn as to lead to the inference that the rest would be merely cumulative, and there is no ground to suspect an intent to conceal a part of the transaction.

Whether the rule should be enforced in all cases, as where those not called are near relatives of the prisoner, or some other special cause for not calling exists, we need not determine; but certainly, if the facts stated by those who are called show *prima facie* or even probable reason for believing that there are other parts of the transaction to which they have not testified, and which are likely to be known by other witnesses present at the transaction, then such other witnesses should be called by the prosecution, if attainable, however nearly related to the prisoner."

In *The State* v. *Magoon,* 50 Vermont, 333, it is said: "In criminal prosecutions the State is bound to produce and use all witnesses within reach of its process, of whatever character, whose testimony will throw light upon and characterize the transaction under inquiry, whether it tends to convict or acquit the respondent, and hence it is not to be prejudiced by the character of the witnesses it produces and uses. The public, in whose interest the prosecution is carried forward, has as much interest in establishing the innocence of the respondent, if he be innocent, as his guilt if he be guilty."

It does occur to me, if there ever was a case in which the rules above announced should obtain, the one at bar was the case. The prosecution was claiming a conviction mainly upon the testimony of a felon, whose competency had to be restored by pardon before he could even testify. Then again, he was the self-confessed murderer himself, and his confessions had been twice sworn to by him,— at the inquest and in the grand jury room; and on this trial he testified, moreover, that he had been promised immunity if he would change his testimony. Such testimony, coming from such a source and flowing through such a tainted channel, does not commend itself as satisfactory or conclusive in the absence of other attainable evidence, which might be adduced with reference to the transaction. It may be that these other eye-witnesses are incompetent, but this is not shown by the record. If kinsmen of defendant, that did not disqualify, however much it might have affected their evidence in the minds of the jury. Polser may have sworn the truth notwithstanding these adverse appearances against him. It cannot be said he was corroborated by the confessions of defendant as testified to by the State's witness Minton, and that between the two the whole *res gestæ* of the transaction was developed, and that it was unnecessary to adduce other evidence. In some very material respects the confessions differ from Polser's statement. The confessions make a case of defense against a direct assault upon defendant; whilst Polser's statement proves a shooting in his, Polser's, defense. Besides

this, the rule is well settled that deliberate and voluntary confessions of guilt should be received and weighed with great caution, because liable to misconstruction, easily fabricated, and often, though false, difficult to contradict. (*Gay* v. *The State*, 2 Texas Ct. App., 127; *Walker* v. *The State*, 2 Texas Ct. App., 326; *Thuston* v. *The State*, 18 Texas Ct. App., 26.)

But it may be urged that defendant could have put these same witnesses upon the stand to prove the facts they knew, and thereby establish by them, if he could do so, the falsity of Polser's evidence and his own innocence. To force him to do so " would be to deprive the defendant of the benefit of the presumption of innocence, and to throw upon him the burden of proving his innocence. It is the *res gestæ*, or the whole transaction, the burden of which rests upon the prosecution, so far at least as evidence is attainable. It is that which constitutes the prosecutor's case, and as to which the defendant has the right of cross-examination; it is that which the jury are entitled to have before them, and until this is shown it is difficult to see how any legitimate inference of guilt, or of the degree of the offense, can be drawn." (*Hurd* v. *The People*, 25 Mich., 404.) . Under the peculiar circumstances of this case the writer is of opinion that defendant's motion to compel the State to put these other eye-witnesses upon the stand was reasonable and should have been granted. These are the individual views of the writer upon this point.

6. On the former appeal in this case the charge of the court was held to be erroneous in restricting the right of defendant to kill solely for the prevention of murder. It was said, "a person when attacked need not resort to other means than killing, where the assault by the deceased indicated an intention *either to murder, maim or inflict serious bodily injury*, but may kill at once and with the most effective means, without resort to other means for the prevention of the injury." (*Hunnicutt* v. *The State*, 18 Texas Ct. App., 498.) In his charge to the jury in this case the learned judge upon this point instructed, with reference to the two phases of the case presented by the evidence, as follows, viz.: "If defendant killed F. E. Umphress, and if, when he fired the fatal shot, said Umphress was making an attack upon Joe Polser which reasonably indicated to defendant that said Polser was then and there in danger of death *or serious bodily injury* at the hands of said Umphress, then such killing would be justifiable homicide, because, under such circumstances, defendant or any other person had the right to kill said Umphress to prevent said threatened injury to Joe Polser. And if

you believe that the killing occurred under these circumstances, you will acquit defendant; and if you have a reasonable doubt as to whether the killing occurred under these circumstances, you will acquit the defendant.

"If defendant did kill F. E. Umphress, and if, when he killed him, said Umphress was in the act of making an attack upon defendant which reasonably indicated to the mind of defendant that said Umphress was about to kill defendant, or was about to inflict upon defendant *some serious bodily injury*, then, under such circumstances, defendant would have the right to kill him, and the killing would be in self-defense. And if you have a reasonable doubt as to whether the killing occurred under these circumstances, you will acquit the defendant."

These instructions are in strict conformity with the law as announced above in our previous opinion. There is a subsequent paragraph of the charge, however, which is in direct conflict with these instructions, and which deprives defendant of his right to kill on reasonable expectation or fear of death or serious bodily injury, without a previous resort to all other means; and a special requested instruction correcting this conflicting and contradictory charge was refused by the court.

It is insisted that a party is not justifiable in taking life simply "*to prevent serious bodily injury*," until he has first resorted to all other means for the prevention of the injury. It is said that the only cases in which homicide is justifiable under our Code are those enumerated in article 570, and these are for the prevention of "murder, rape, robbery, maiming, disfiguring, castration, arson, burglary and theft at night," etc.; that in every other case of "*violent assault or attack*," article 572 applies; and that, in accordance with said article, all other means must be resorted to for the prevention of the injury, before the killing is justified in law. The position is that article 574 is but a part of, and intended alone to qualify, article 572. One of the positions assumed is that the word "attack" is for the first time used in article 572, and that, because article 574 gives the requisites of "the attack," therefore it must refer only to said article 572.

The speciousness and fallacy of this position is easily seen when we reflect that it is impossible to conceive how a party could commit any of the personal injuries mentioned in article 570, such as murder, etc., unless he did so by an "attack." All the personal injuries mentioned in article 570 are injuries which can alone be inflicted by means of an "attack." Article 574 reads: "The attack

upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or serious bodily injury." A party is about to murder me, that is, he is making an attack upon me which produces a reasonable expectation or fear of death,—it may be murder or it may not,—it reasonably appears to me that whatever it is I may expect and I do fear death from it: must I sacrifice my life in stopping to debate and determine the question of murder or no murder? And must I hunt round for other means, and perhaps lose my life in doing so, before taking my assailant's life? If this be the law, then article 570, which justifies slaying to prevent murder, is entirely abrogated and is a delusion and a fraud. My assailant is about to inflict serious bodily injury upon me; my expectation that he is going to do so is reasonable; his attack may disfigure me or maim me; I cannot tell whether it will or not. Am I to wait until his intention is put beyond all doubts by the loss of a limb or an eye, or the breaking of my nose; or must I resort to all other means, and in doing so sacrifice my limb, eye, or the shape of my nose, before I can take his life to prevent the injury? If such is the law, then article 570, with regard to maiming or disfiguring, may be rendered entirely worthless and nugatory. A reasonable expectation or fear of death at the hands of another who is making an unlawful or violent attack upon me is a reasonable expectation or fear of murder, and I have a right to kill upon such reasonable appearances without resorting to other means. And so of serious bodily injury. It is impossible to tell whether the violent and unlawful attack is going to stop short of maiming or disfiguring; I know it is going to produce serious bodily injury unless I meet it promptly; and in order to prevent it I have the right to kill without resorting to other means. An assault and battery, causing pain or bloodshed, is adequate cause sufficient to reduce a homicide from murder to manslaughter. (Code Crim. Proc., art. 597.) If this be so, then one causing serious bodily injury in reason should justify the homicide.

We are of opinion that article 574 was never intended solely as an addenda to or qualification of article 572, though it may be applied to it, but that it was intended as an independent declaration with regard to the law of self-defense, which should be applied to all attacks producing a reasonable expectation or fear of death or serious bodily injury. It is but folly to contend that it is no part of the article 570, because there are two or more articles intervening, presenting different aspects of the law of justifiable homicide. Just as well contend that article 573, which declares that retreat is not

necessary, is also inapplicable to article 570, because thus separated from it. It will hardly be contended, we imagine, that article 573 should not be given in charge on a trial for murder where self-defense was claimed in justification under article 570.

But we will not pursue the discussion further. This question has been discussed time and again, and has become fixed and settled in the jurisprudence of this State by the following authorities: *Blake* v. *The State*, 3 Texas Ct. App., 588; *Ainsworth* v. *The State*, 8 Texas Ct. App., 538; *Kendall* v. *The State*, 8 Texas Ct. App., 577; *Bright* v. *The State*, 10 Texas Ct. App., 68; *Foster* v. *The State*, 11 Texas Ct. App., 105; *Jordan* v. *The State*, 11 Texas Ct. App., 448; *Buddy* v. *The State*, 14 Texas Ct. App., 540; *Branch* v. *The State*, 15 Texas Ct. App., 103; *Short* v. *The State*, 15 Texas Ct. App., 376; *Gilly* v. *The State*, 15 Texas Ct. App., 301; *Sterling* v. *The State*, 15 Texas Ct. App., 256; *Cartwright* v. *The State*, 16 Texas Ct. App., 473; *Morgan* v. *The State*, 16 Texas Ct. App., 595; *Jones* v. *The State*, 17 Texas Ct. App., 611; *Hunnicutt* v. *The State*, 18 Texas Ct. App., 522. We believe these decisions to be correct, and if they were not we would be indisposed at this day to overrule them.

The two instructions quoted above from the charge of the court were correct and in harmony with these decisions, and the court erred in confusing and neutralizing them by a subsequent paragraph of the charge, and should have given the first special requested instruction of defendant.

For the errors we have pointed out in the charge, the judgment is reversed and the cause remanded.

### DISSENTING OPINION OF HURT, J.

HURT, JUDGE. This is a conviction for murder of the second degree, with the penalty fixed at confinement in the penitentiary for the term of twenty years. I will not discuss the points in the order in which they are presented in the brief of counsel, but will notice such as are deemed important.

First in regard to the action of the court below upon the application for change of venue. Appellant moved for a change because of so great a prejudice against him in the county of the prosecution that he could not obtain a fair and impartial trial. This application was supported by affidavit signed by twelve citizens of Dallas county. An issue was formed by the filing of a counter-affidavit of W. H. W. Smith, to the effect that the means of knowledge of defendant's compurgators were not such as would authorize the inference that such prejudice did exist. This affidavit was excepted

to by appellant upon the ground that it neither denied the credibility of the compurgators, nor their means of knowledge.

The statute upon this subject is somewhat vague and indefinite. It says, "the credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked *by the* affidavit of a credible person, and the issue thus formed shall be tried and determined as the law and the *facts* shall warrant." (Italics ours.)

It is insisted by counsel for appellant that the affidavit of Smith does not attack the means of knowledge of the compurgators. Now just in what language this must be done is not stated in the statute, nor is the form prescribed. Smith swears "that the means of knowledge of the parties signing the supporting affidavit is confined to their particular neighborhood, which does not include the whole county, and that their means of knowledge is besides limited, they not being acquainted with the sentiments of the people of Dallas county about the matter contained in said motion;" "and that in fact there is no such prejudice in Dallas county as will prevent defendant's obtaining a fair and impartial trial."

This is evidently an attack upon the means of knowledge of the persons supporting the application. It is true that it does not state in *terms* that the means of knowledge is not sufficient, or is insufficient; but the facts are given without such conclusion. This we think is sufficient.

The only important question presented in the record is that relating to the charge of the court upon the question of self-defense. After giving a most careful consideration to all the supposed errors, I am of the opinion that there was no such error committed upon the trial of this case as will require a reversal of the judgment, unless there be error in the charge upon the doctrine of self-defense.

The court in effect charged the jury that, if the killing was to prevent the offense of murder, maiming or disfiguring, the party killing was not required to resort to all other means to prevent the threatened injury; and further, in effect, that if the killing was to prevent the infliction of *serious bodily injury*, then in such case the party killing must resort to all other means to prevent the injury.

Let us concede for the argument that there is evidence tending to show that deceased was in the act, when shot, of inflicting upon defendant serious bodily injury, and hence the charge upon this subject was not abstract, did the charge of the court under discussion *contain the law?* The writer was very much entertained by the discussion of this case. Counsel for appellant stated the issue clearly

and sharply, and rested their case on this point, upon a long line of decisions of this court.   Mr. J. C. Kearby, assisting the State, argued the cause for the prosecution, and in his argument he fearlessly but courteously denied the correctness of the opinions of this court upon this subject.   This is well and commendable; for if in error, this court should be informed of it in plain language, so that if convinced of the error it may be corrected at the earliest moment.   By this discussion I have been led to review the subject, giving to it my most earnest and searching investigation, and will now proceed to give my views upon the question presented; which is, was the charge of the court correct?

Upon this subject, as upon nearly all others relating to law, light can be gathered from the common law.   When the common law is looked to we find that to prevent murder the party, before killing his adversary, was required not only to resort to all other means to prevent the threatened crime, but was to retreat to the wall.   Now, what change, if any, has our Code made upon the common law upon this subject.   I answer, 1st, that in no case when the person or property is unlawfully attacked is the party bound to retreat in order to avoid the necessity of killing his assailant.   But the question is, under what state of facts can the party assaulted kill the assailant without resorting to all other means to prevent the threatened injury?   Or under what state of case must the party assaulted resort to all other means to prevent the injury?

It is evident that if the homicide be committed to prevent any of the offenses named in article 570, Penal Code, the party killing would not be required to resort to other means to prevent the commission of these or either of these offenses; for our statute specifically enumerates the circumstances under which a killing, to prevent either of the offenses named in said article, must take place in order to justify the homicide.   It provides, 1st: It must reasonably appear by the acts, or by words coupled with the acts, of the person killed, that it was the purpose and intent of such person to *commit one of the offenses above named.*   (Italics mine.)

When must the killing take place?   The killing must take place while the *person killed* was in the act of committing *the offense.* What offense?   Evidently one of the offenses named in article 570; or after some act done by him showing evidently an intent to commit *such offense.*   The provisions in subdivisions 3, 4, 5, 6, 7, 8 and 9 of article 570 will not be discussed because not applicable to the facts of this case.   But it will be seen by article 570, and its subdivisions, that the exact circumstances are set forth under which a

homicide, to prevent one of the offenses named in such article, will be justified, and it is obvious that the party killing, to prevent one of these offenses, is not required to resort to other means to prevent the commission of the threatened offense, because nothing of the sort is required by the Code, which evidently intended to enumerate — set forth — all the acts necessary to be done by the slayer in order to his justification in killing the aggressor. And it is by virtue of this fact — this enumeration of the circumstances under which the killing must take place — that the common law rule requiring the party, before killing, to resort to all other means to prevent the offense threatened is abrogated. And it is equally evident that this common law rule is abolished only in the cases, under the state of facts, distinctly named in the Code, and which are found in article 570.

This question arose in the Horbach case, 43 Texas, 252, and in treating of the subject Chief Justice Roberts says that, by article 572, " it is intended to provide the rule that when *any other* unlawful and violent attack is made *than* one in which the acts of the deceased manifest the intention to murder or maim, or to commit rape, robbery, arson or theft at night, defendant is required to resort to all other means before killing his assailant to prevent the injury. Why? Because in such an attack *it is presumed* that there *may* be *time* and opportunity to resort to other means." (Italics mine.) But, as provided for under the preceding article 570, where at the time of the killing some act has been done by deceased showing evidently an intent to commit such offense (murder or maiming, etc.), then and there, in that event, the party thus attacked need not resort to other means before killing his assailant; because *it is presumed* in such a case that the party's safety depends upon his prompt action in killing his adversary. Thus, when an unlawful and violent assault is committed, the degree and character of the injury *intended by the assailant*, as then indicated by *his acts*, then done, is *made the test* of whether the party attacked may at once kill, or must resort to all other means for the prevention of the injury before killing." Chief Justice Roberts here most evidently asserts the rule that to relieve the party killing from the necessity of resorting to all other means before killing to prevent the injury, it must be to prevent one of the offenses named in article 570, and that in all other cases, or to prevent any other unlawful and violent attack, resort must be made to all other means before killing.

We find, therefore, that our statute, in article 570, has departed from the common law in two respects: 1. No retreat. 2. If to

prevent murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, and theft at night, or where the party slain in disguise is engaged in any attempt, by word, gesture or otherwise, to alarm some other person or persons and put them in bodily fear, the slayer is not required to resort to other means, but may kill at once.

Homicide is not only justifiable in the prevention of the offenses named in article 570, but is also justifiable in the protection of the person or property against *any other unlawful and violent attack besides those* mentioned in article 570. Under what circumstances? If the unlawful and violent attack be *any other* than those mentioned in article 570, and is made upon the person or property, in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack.

Now, if it is not the intention of the party killed to commit one of the offenses named in article 570, but to make an unlawful and violent attack upon the person or property of another, under this state of case article 572 gives the right to slay, holding the slayer harmless if he slays the aggressor under certain prescribed circumstances. They are that he must resort to all other means before killing to prevent the injury, and he must slay while the assailant is in the act of making such unlawful and violent attack. And this is not all; our statute is very cautious upon this subject. It describes the nature and character of the attack upon the *person*, and is very minute in setting out the circumstances under which a homicide will be justifiable when committed in the protection of *property*. But, back to the attack upon the *person*.

The attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of *death* or *serious bodily injury*. It will be noticed that to prevent one of the offenses named in article 570 the degree and character of the injury intended by the *assailant*, as indicated by his acts then done, is made the test of whether the party may at once kill the assailant, or must resort to other means for the prevention of the injury before killing him. Not so under article 572, because article 574 gives the right to slay when done under the circumstances named in article 572, whether the assailant intended to murder or endanger the life of the person killing or not. If the attack be such as to produce a reasonable expectation or fear of death, whether the assailant intended to take life or not, then the party is justified in killing; and if the attack be of such a character as to produce in

the mind of the slayer a reasonable expectation or fear of some serious bodily injury, if he kills under the circumstances named in article 572 he will be justified.

This is the rule at common law, and in this as in article 570 the party is not bound to retreat. No retreat here constitutes the only departure from the common law.

Before leaving this subject I desire to make an observation on the Horbach case. In that case there was evidence in the record tending to show that deceased intended to murder or maim the defendant Horbach. This being the case, the charge of the court was evidently wrong; because it required Horbach to resort to all other means to prevent the injury before killing, as well in a case for the prevention of murder and maiming as in a case to prevent *any other* unlawful and violent attack, thus blending articles 570 and 572; and Chief Justice Roberts, discussing this matter, says: " This confusion from blending the two rules might have been obviated by giving the third charge asked by defendant's counsel, which was refused by the court only upon the ground that it was deemed to have been substantially given. This third charge was intended to separate the rules contained in the different articles."

Again, I wish to call attention to an expression of Judge Roberts in regard to article 574. He says that " the proposition stated in the charge, to wit: that the attack so made was of such a nature as to have produced in the mind of this defendant a reasonable expectation or fear of death or serious bodily injury, is not contained in article 572." This is true; it is not a part of said article; but does it not qualify said article? Does it not describe the attack therein mentioned? I think so, nor do I believe that Judge Roberts intended to intimate to the contrary.

I therefore conclude:

*First.* That when it reasonably appears to the party killing that it was the *intention of the assailant* to commit the crime of murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, and theft at night, it is not required of the party killing to resort to other means for the prevention of the crime, but he may act instantly. But, if it does not reasonably appear to the party killing that it was the *intention* of the person killed to commit one of these offenses, then, to be justified, the party killing must resort to all other means before killing, to prevent the injury.

It therefore follows that if the attack upon the person of an individual be such as to produce a reasonable expectation or fear of some serious bodily injury less than rape, maiming, disfiguring or

castration, to justify, the party killing must resort to all other means before killing, to prevent the injury, and must kill while the person killed is in the very act of making such attack.

I have written several opinions holding a contrary doctrine, but I am now convinced that I was in error and take this opportunity to correct the same; and I think that the cases in conflict with the views herein expressed should be overruled.

I do not agree to the proposition that the State could be forced by the defense to introduce as witnesses Waller, Hunnicutt and Herndon.

Upon this subject Mr. Bishop says: "In general a party, whether State or defendant, may exercise his choice either to call or decline any competent witness. . . . Some courts deem that a prosecuting officer ought, in murder or other like crimes, to call as witnesses all who were present at the transaction, whatever be the nature of their testimony; others regard it properly within his discretion to produce such and such only as he thinks best."

With the last mentioned rule I concur. If it has ever been the practice in this State to force the State to call all the witnesses to the transaction, I am not aware of such practice. Such a rule would work serious injury to the State and tend to confusion.

Let us suppose that there were present friends and relatives of the defendant, as was so in this case,— Ike Hunnicutt being a brother and Herndon a cousin by marriage,— or persons of notoriously bad reputation for truth. The State introduces them; they swear to facts exonerating defendant. Other witnesses are introduced, but they all are the witnesses for the State. By introducing them, their character for truth and veracity is indorsed by the State, and, to convict, their evidence must be destroyed. This cannot be done by proof of general bad character for truth. I could enlarge upon this subject but deem it unnecessary, the above observations being very suggestive.

We have very carefully considered the other points presented by counsel, but do not think it necessary to discuss them here,— believing it will be found that, if not all of them have been passed upon by this court, at least such have been as require serious attention.

That the evidence, if the witnesses are worthy of credit, is sufficient to support the verdict, there can be no doubt, and the jury whose duty it was, have passed upon the credibility of the witnesses, and from the verdict they must have believed them.

The judgment should be affirmed.

*Reversed and remanded.*