## Charles Hurd v. The People.

*Homicide: Fear of great bodily harm: Excusable homicide: Provocation: Manslaughter.* Where one, who has just been assaulted and set upon by another, is immediately followed up, in a threatening manner, by the person committing such assault, with the intention of scaring or frightening him, into his own house, and through one of the rooms, in the presence of his family, and there shoots and kills such intruder, the killing, if done under the belief, with good reason, that it was necessary to shoot the assailant to save his own life, or to protect himself from danger of great bodily harm, is excusable homicide; and if done under a less degree of fear, and in the excitement and confusion caused by the threatened repetition of the attack, and if, but for this provocation, the shooting would not have occurred, the crime does not exceed manslaughter.

*Cooling time.* Where the whole transaction, in such case, from the first attack out-of-doors to the final shooting in the house, is, in its nature, a single transaction, occupying altogether less than fifteen minutes, it is not proper to treat it as two distinct and separate transactions, with an interval, for the purpose of raising the question of a cooling time.

*Malice.* The fact that, between the first attack and the final shooting, the person who did the killing, armed himself, when taken in connection with what preceded and what followed in this case, had no tendency to show malice.

*Criminal law: Prosecution should put in evidence of the whole res gestae.* The prosecution can never, in a criminal case, properly claim a conviction upon evidence which, expressly or by implication, shows but a part of the *res gestae*, or whole transaction, if it appears that the evidence of the rest of the transaction is attainable; and, as a general rule, all the witnesses present at the transaction, that are attainable, unless it appears that the testimony of those not called would be merely cumulative, should be called for the prosecution before the prisoner is put to his defense.

*Murder:   Statements of deceased made in extremis:*   On a trial for murder, the statements of the deceased, made after the shooting, and while he was under the apprehension and belief of speedy death, and relating to an important part of the transaction connected with the shooting, are competent evidence.

*Evidence:   Statements of deceased.*   It is competent to show that the deceased, after the shooting, and while he believed he was going to die, had an interview with the defendant, at which the shooting was talked over, and then and there acknowledged that he was to blame, and asked defendant to forgive him.

*Error cured.*   The error committed in excluding this proposed evidence was cured, in this case, by permitting the witness by whom it was proposed to show this fact, to state what was actually said on the occasion alluded to.

*Murder trial:   Evidence:   Temper and disposition of deceased.*   It was competent in this case to show, that the deceased was a man of high temper and quarrelsome disposition, and known by the defendant to be so at the time of the shooting.

*Threatened assault:   Homicide:   Fear:   Apparent danger.*   One who is threatened with immediate attack by an assailant, is authorized to act, and his actions are to be judged, in the light of the circumstances as they appeared to him at the time; and if the assailant follows him up in a threatening manner for the purpose of frightening him, and so as to make him believe that a violent attack is imminent, it is immaterial whether a forcible attack was actually intended or not.

*Heard July 12.    Decided October 8.*

Error to Ionia Circuit.

*Wells & Morse* and *John C. Blanchard,* for the plaintiff in error.

*Dwight May, Attorney General,* for the People.

CHRISTIANCY, CH. J.

The plaintiff in error (defendant below) was tried at the Ionia circuit, upon an information charging him with having murdered Chauncey M. Hubbard.   The jury, by their verdict, found him guilty of murder in the second degree, upon which judgment was rendered against him, and he now brings the case to this court upon writ of error and bill of exceptions.

For a full understanding of the questions raised by the exceptions, it is proper to state the nature of the whole transaction, including the material circumstances which led to, accompanied, and followed, the homicide.

It was admitted, and not disputed, on the trial, that Hubbard was shot by the prisoner, and that he died from the effects of the wounds caused thereby.    The only questions, therefore, which could arise, were, whether the circumstances under which the shooting took place were such as to render the shooting justifiable or excusable, and if not, then, whether they were such as would negative malice aforethought, and reduce the offense to manslaughter.

Hubbard was much the larger, and apparently the stronger, man of the two.    Hurd had been seriously injured some five or six years before, by a log rolling over him, and seems not to have fully recovered, but was, in consequence, easily excited, his nervous system somewhat shattered and unstrung, and not fully under his control. They had always been on good terms with each other, with no evidence of ill-feeling from Hurd, though there was some slight evidence of previous ill-feeling on the part of Hubbard.

The transaction occurred on the evening of the 8th of August, 1871, in and near the house of Hurd.    Hubbard had for some time been at work building a barn for Hurd, and, having been absent that day, returned about supper time, while Hurd and his family and some workmen were at supper, and, without coming to supper, went to work at the barn, a few rods from the house.

At the supper table there were present, besides Hurd himself, several hired men, some working for him, and some upon the barn for Hubbard, and several women, and a child.    A slight difficulty occurred at the supper table, and some words passed between Hurd and a young man, or boy, by the name of Mapes, who was at work for him, in reference to helping the boy to a piece of pie, the boy, or some other person, as it would seem, seeking to help himself and not succeeding very well, Hurd proceeded to take the

pie and help him, at which some remark was made by
Mapes, to the effect that, "perhaps he" (or the other per-
son helped, for it is not certain) "would prefer to help him-
self," to which Hurd replied, in substance, "You are in my
house, and at my table, and if you live to be older you
will know more than you do now." At this the boy
Mapes took offense, left the table, and went out to the
barn (a few rods off), and reported to Hubbard what had
taken place; Hurd and the other workmen, almost at the
same time, being through supper, going out also. Imme-
diately after this, Hurd and Hubbard are seen coming from
the road toward the house, apparently in earnest conversa-
tion, the first words heard being from Hubbard, saying,
"The boy has no friends here to take care of him" (or to
take up for him); Jerome Evans is present (who was at
the supper table, and saw what occurred there), and Hurd
turns to him and says, "Jerome, did I abuse the boy?"
He repeats the question, but Evans makes no answer.
Hubbard then steps up to Hurd, as it would seem, in
an excited manner, and Hurd says, "Do you think I am
afraid of you, Mr. Hubbard," to which, one witness (Dow)
says Hubbard replied, saying, "I do not want you to be
afraid of me," and the other, Evans (for these were the
only two who saw the transaction at this stage), says, Hub-
bard, then, with his fists doubled (though Dow does not
mention the fists), got him by the lappels of the coat, and
shook him six or seven times (as he himself afterwards
admits to several witnesses) severely; jerking, or throwing,
him down. Evans then steps up and says, "Don't; I
wouldn't have any fight, Mr. Hubbard. Oh, don't! I
wouldn't." To this, Hubbard, acting, as Evans says, as if
he was endeavoring to pick up a stick or a stone (though
Dow does not notice this), rises up and comes toward
Evans saying, "Get right away, Jack, or I will go through

you like a yoke of oxen." Evans steps back a few paces; Hubbard comes toward him. While this is going on, Hurd starts hurriedly for the house. Hubbard follows him up in an angry manner, and says to Hurd, as the latter is entering the house, "Come back, Hurd;" to which Hurd replied, "No; you don't get me out there to shake me again;" and, going into the house, locks the doors. He asks his wife where his pistol is, and goes in search of it, but not at once finding it, he takes his Spencer rifle in his hand. Dow comes to the door, to come in. Hurd, supposing it to be Hubbard, refuses to let him in; but, being told it is Dow, lets him in, and locks the door again. Dow goes to his supper, and Hurd, presently finding his pistol, loads it. He then goes out, having his pistol in his hand, leaving in the house, his wife, two young ladies (his step-daughters), Mrs. Frear and her child, and Dow, who was eating his supper. Hurd goes out toward the barn, and calls to Hubbard, saying, in substance, "Mr. Hubbard, if you are not satisfied, or if you think I abused the boy, come in and ask the women folks; come and ask Mrs. Hurd." Hubbard, who is engaged in ripping a board with his saw, drops his saw, and starts rapidly towards Hurd (some saying that he ran, others that he walked very fast). Using his own language, as given by himself afterwards, he "went for him," "meaning," as he several times reiterated after he was shot, and expected to die, "to frighten him, or to scare him." Hurd retreats rapidly to the house, saying to him, "Come and ask Mrs. Hurd; ask Mrs. Hurd." Hubbard is close upon him as Hurd enters the house, and coming on, in a threatening manner, directly towards him. As Hubbard gets near, or at, the threshold, Hurd, looking back, tells him to stop, but he still advances. Hurd, still telling him to stop, hurries through a part of the room where the family are (and where Dow was at his supper),

25 MICH.—52.

into the door of the bedroom opening from this room, the door of which had no fastening, and turning around, with one hand on the door, fires his pistol at Hubbard, then from three to six feet from him and still advancing upon him. This shot wounds him in the breast and penetrates his lungs, but he does not stop. Hurd retreats a little, and Hubbard advances, and reaches for the pistol, but receives a second shot in the bowels. He then puts his hand to his breast, saying, "You have hurt me, Charlie;" and turns to go out the front door, but, this being locked, he goes out at the back door, at which he had followed Hurd in; goes out into the road, and up towards a neighbor's, Mr. Wheeler's; but, before getting there, is compelled to stop, and lie down.

As soon as Hubbard leaves, Hurd comes out, and sends at once for the doctor, saying he had shot Hubbard. He exhibits the greatest distress and sorrow, weeping and shedding tears; goes to Mr. Alderman, tells him what has happened, giving him his pistol. He hurries to where Hubbard was lying, wants to take him back to his own house and take care of him, but Wheeler's being nearer, or Hubbard preferring to go there, Hurd goes there, gets a settee, and assists in taking him there. While there, with the physicians and neighbors around him, and under the belief that he will not recover, he at several times states the main facts of the occurrence, fully admitting, in all his statements, the assault he made upon Hurd, and the cause of it, as above stated, and fully admitting, in all those statements, that at the time he followed Hurd into the house, he went fast, or, in other words, that "he went for him," and in a threatening manner, with the intention of frightening or scaring him, but, to some of the witnesses, as they testify, he said he did not know whether Hurd told him to stop or not; to others, as they testify, admitting

that Hurd did order him to stop, and that after the first shot, he was still "going for him" to get the pistol from him.

The next day (the 9th) when Hurd came in, he called him and said to him, "Charlie, we have always been friends." Hurd said, "Yes;" and they asked each other to forgive. Hubbard died on the 10th.

I have said that Hurd, when Hubbard was following him up into the house, ordered him to stop, when at, or near, the threshold, and after he got in. I have stated this because the testimony is so absolutely overwhelming to this point, that, if this distinct question had been left to the jury, and found in the negative, it would have been the proper, if not imperative, duty of the court, promptly to have set aside the verdict; the People having called but two witnesses to what took place in the house,—Dow, who was the nephew of Hubbard, and who saw the assault made by Hubbard outdoors as well as in the house, and who swears positively to Hurd's telling Hubbard to stop, and Mrs. Frear, who only saw what took place in the house, and who did not, or says she did not, hear this, though she admits that, from the way Hubbard came in, she was frightened, expected a fight, that her child was frightened, and that she was much engaged in taking care of it, and trying to get out. While all the other women in the house (three of them), as well as Dow, swear positively that Hurd did repeatedly tell Hubbard to stop, and come no further, but that he kept on, and was shot, as already stated. That she did not hear it, under such circumstances, can hardly be said to contradict at all, the evidence of the others who did, or to be any evidence, that Hubbard was not ordered to stop. But, however this may be, there was no controversy upon the facts, admitted and repeatedly declared by Hubbard

himself, after the shooting, and when he had given up all hopes of living, that he did follow Hurd up into the house in a threatening manner, intending to scare or frighten him, in other words, to make him believe that he did intend again to attack him, and *that, in his own house, in the presence of his family.* And Hurd · had a right to act upon that belief, or upon circumstances as they appeared to him, though Hubbard might not have intended actually to make the attack; and if Hubbard had been armed with a dangerous weapon, this would have tended very clearly and strongly to show a case of excusable homicide; but, as he was not armed with a dangerous weapon, the main question upon the evidence would seem to be between excusable homicide and manslaughter; *excusable* homicide, if the jury were satisfied that Hurd, being in his own house, had reason to believe, and did believe, from Hubbard's actions and manner, and what had already taken place, that it was necessary to shoot the assailant to save his own life, or to protect himself from danger of great bodily harm; *manslaughter,* if he did not so believe, but committed the act under a less degree of fear, and the excitement and confusion caused by the first assault, coupled with the then threatened repetition of the attack, and that but for these, he would not have fired the fatal shots. What provocation, and what degree of excitement · or confusion of mind, will reduce a homicide to manslaughter, as well as the nature of the circumstances which will render it excusable, have been so fully explained in *Maher v. The People, 10 Mich., 212; Pond v. The People, 8 Mich., 150,* and *Patten v. The People, 18 Mich., 314* (clearly recognized in the charge in this case), that we do not deem it essential to go fully into these questions here.

I have detailed the whole transaction, or *res gestae;* and it must be considered a single transaction, at least

from the first assault or attack upon Hurd outdoors to the final shooting of Hubbard.    The witnesses differ as to the length of time intervening, some stating it to be not more than three minutes, others, not more than twenty or thirty; the weight of the testimony would make it less than fifteen minutes.    It was entirely idle for the prosecution to attempt to divide this into two separate transactions:    1st. The assault upon Hurd outdoors, a transaction which was, as they claimed, complete and ended when Hurd retreated into the house; and, 2d. An entirely new and separate transaction occurring in the house at the time of the shooting; and thus to raise the question of cooling time.    The transaction was manifestly one and entire, all its parts inseparably connected; and when Hubbard followed Hurd up into the house, threatening another attack, Hurd was authorized to, and manifestly must have construed his actions and intentions there, with reference to, and in connection with, what had previously taken place out-of-doors.

Now it is quite manifest, and no one, in the face of the facts stated, would have the assurance to deny it, that if Hubbard had not made the first assault upon Hurd outdoors, and then followed him up with the apparent intention of attacking him again, the shooting would not have occurred.    These acts, in fact, constituted the provocation, without which the act would not have been committed.    The provocation may not have been sufficient, it is true, to excuse the act, or entirely to take away its criminality; that depends upon the question, whether, as already stated, the acts of Hubbard, and the circumstances as they appeared to Hurd under the excitement, haste and confusion of the moment, rendered it necessary, in his opinion, for the protection of his life, or to avoid grievous or dangerous bodily harm.    The fact that he

armed himself before going out the second time, when taken in connection with what preceded and what followed, cannot be considered as tending to show malice, however strong may be its tendency to establish a case of manslaughter. His conduct showed, that he was anxious to have the matter of the difficulty with the boy, which had so excited Hubbard, fully explained to him, and for that purpose wished him to inquire of the women. His arming himself before he went out to invite him to come and hear the explanation, would seem to [have been only to protect himself against the rashness which he had reason to apprehend from Hubbard. And, upon the evidence, there is no room for doubt, that, had Hubbard come in quietly and listened to the explanation, the difficulty would have been amicably settled. All the evidence tends to show, that, but for the foolish and reckless bravado of Hubbard in following him up in a threatening manner so as to make him apprehend an instant attack, Hurd would never have fired. But there being no evidence of previous malice, and the contrary being shown, there was clearly no evidence in the case tending to show murder, either in the first or second degree; unless it be the evidence of Mrs. Frear alone, and not even hers, unless the whole transaction was such only as appeared by her testimony, to the exclusion of all the other evidence in the case. But, aside from the improbability of such a conclusion, the prosecution were not at liberty to put the case to the jury upon any such hypothesis; for, *confessedly, the whole transaction did embrace much more than that shown by her testimony.* She only saw what occurred in the house; she knew nothing of what had taken place outdoors; and therefore contradicted nothing stated by other witnesses, as having occurred there. The prosecution had already, by Dow, their own witness, on his direct examination, proved the assault

made by Hubbard upon Hurd out-of-doors, and by him and Mrs. Frear, the occasion of it. They proved also that Hubbard followed him up in a hurried and threatening manner, when he went into the house the second time, and, by Hubbard's own admissions, that this was done to scare or frighten him; and these facts were uncontradicted, and admitted. But Mrs. Frear spoke only of what occurred in the house, which, therefore, was *confessedly but a portion* of the transaction. Had what she testified to, constituted the whole transaction, her evidence would have had some tendency to prove the transaction to be murder; as she says she heard Mr. Hurd tell him to come in and ask Mrs. Hurd, and did not hear him tell him to stop, and come no further; still, even she admits, that, from the way he came in, she was frightened and tried to get outdoors with her child; tending to show, at least that Hurd had some cause of alarm, and reason for acting hastily and without due consideration.

But the prosecution can never, in a criminal case, properly claim a conviction upon evidence which, expressly or by implication, shows but a part of the *res gestae*, or whole transaction, if it appear that the evidence of the rest of the transaction, is attainable. This would be to deprive the defendant of the benefit of the presumption of innocence, and to throw upon him the burden of proving his innocence. It is the *res gestae*, or whole transaction, the burden of proving which, rests upon the prosecution (so far at least as the evidence is attainable). It is that, which constitutes the prosecutor's case, and as to which, the defendant has the right of cross-examination; it is that, which the jury are entitled to have before them, and, "until this is shown, it is difficult to see how any legitimate inference of guilt, or of the degree of the offense, can be drawn."

The prosecutor, in a criminal case, is not at liberty, like a plaintiff in a civil case, to select out a part of an entire transaction which makes against the defendant, and then, to put the defendant to the proof of the other part, so long as it appears at all probable from the evidence, that there may be any other part of the transaction undisclosed; especially, if it appears to the court that the evidence of the other portion is attainable. The only legitimate object of the prosecution is, "to show the whole transaction, as it was, whether its tendency be to establish guilt or innocence." The prosecuting officer represents the public interest, which can never be promoted by the conviction of the innocent. His object, like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success. And, however strong may be his belief of the prisoner's guilt, he must remember that, though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and dangerous to the whole community. And, according to the well-established rules of the English courts, all the witnesses present at the transaction, should be called by the prosecution, before the prisoner is put to his defense, if such witnesses be present, or clearly attainable.—See *Maher v. The People, 10 Mich.,* *225, 226.* The English rule goes so far as to require the prosecutor to produce all present at the transaction, though they may be the near relatives of the prisoner.—See *Chapman's case, 8 C. & P., 559; Orchard's case, id., note; Roscoe's Cr. Ev., 164.* Doubtless where the number present has been very great, the production of a part of them might be dispensed with, after so many had been sworn as to lead to the inference that the rest would be merely cumulative, and where there is no ground to suspect an intent to conceal a part of the transaction. Whether the

rule should be enforced in all cases, when those not called are near relatives of the prisoner, or some other · special cause for not calling them exists, we need not here determine. But, certainly, if the facts stated by those who are called, show *prima facie*, or even probable reason for believing, that there are other parts of the transaction to which they have not testified, and which are likely to be known by other witnesses present at the transaction, then, such other witnesses should be called by the prosecution, if attainable, however nearly related to the prisoner. But (though no objection seems to have been made on the trial), we allude to this subject here, for the purpose of calling attention to the evident disregard, on the trial of this case, of the rule laid down by this court, in *People v. Maher*, above cited. According to the rule there laid down, and from which we see no reason to depart, the prosecution should have been put to call Jerome Evans, at least, who was present at the first assault, and took part in stopping the affray, as shown by the witness Dow, on the part of the prosecution. In the very nature of the case, he was the People's witness, and should have been called by them, he being, as is evident, attainable, and subsequently sworn for defendant; and it appeared from his testimony, that he heard the conversation leading to the first assault, at an earlier stage than Dow; and no relationship to, or complicity with, the defendant, is shown or pretended.

We now proceed to the special exceptions. It is assigned as error, that the court allowed Abraham Alderman, on the part of the People, to testify what the deceased said to him after the shooting, as to the manner in which the defendant called the deceased into the house. As evidence had already been given, tending to show that the deceased, at the time of making the statement, was

under the apprehension and belief of speedy death, and the statement related to an important part of the transaction connected with the shooting, we see no force in the objection.

It is also alleged as error, that the court declined to allow the counsel for defendant to examine Doctor Joslin, to show that, after the shooting, while the deceased believed that he was going to die, the defendant and the deceased were present together, and talked the matter of the shooting over, and that the deceased then and there acknowledged that he was to blame, and asked defendant to forgive him. But this error (for it would otherwise have been an error) was cured by the witness himself stating what was actually said on the occasion alluded to, viz: that when Hurd came to the house where Hubbard lay, Hubbard called Hurd and said, "Charlie, we have always been friends." Hurd said, "Yes;" and they asked one another to forgive. "I don't know," said the witness, "as he said any thing, in particular, about who was to blame." The defendant, therefore, could not have been prejudiced by the refusal to admit the proposed evidence when offered.

But it is further alleged as error, that the court refused to allow the defendant to show by the witness, Jerome Evans, that the deceased was a man of high temper, and quarrelsome disposition, and known by the defendant to be so at the time of the shooting. This, we are satisfied, was a serious error, directly affecting the question of the defendant's guilt. And, if the defendant, when threatened with immediate attack by an assailant, is authorized to act, and his actions are to be judged, from the circumstances as they appeared to him at the time, as held by this court, in *Pond v. The People, 8 Mich., 150,* as admitted by the court in his charge (a principle of natural justice which must never be overlooked in such cases), then it necessarily fol-

lows that the evidence offered was admissible; since the knowledge or belief of the prisoner, that the person threatening him with an immediate personal attack, is a man of high temper, and quarrelsome disposition, is a most important circumstance, from which he is to estimate the probability and the character of the attack, and what course of conduct he has reason to expect from the assailant, as well as the means which, at the moment, he may deem necessary, to guard himself from the threatened danger.    This must, in the nature of the case, be so with any man placed in the situation the defendant occupied at the moment of the shooting.

And after what has already been said, it is hardly necessary to remark, that it is quite immaterial in this case, whether Hubbard actually intended to make a forcible attack upon Hurd or not, at the time he was shot; since, from Hubbard's own repeated statements after being shot, he was following Hurd up in such a manner as to frighten him, which he could not expect to do without making Hurd believe from his actions, that a violent attack was imminent.

The judgment must be reversed, and a new trial awarded.

The other Justices concurred.