PEOPLE v. CHRISTMAS.

1. EVIDENCE—DYING DECLARATIONS—HEARSAY.
Before a statement made by a victim of homicide is admissible in evidence as his dying declaration, a preliminary investigation must be made by the court to determine its admissibility; and should be of such nature as to satisfy the court that the declarant was in fact *in extremis* when he made the declaration and that he made it under a sense of impending death.[1]

2. SAME—DEATH—HOMICIDE.
Evidence that the declarant was under the conviction of approaching death should usually be offered as a basis for the admission of the declaration.

3. SAME.
Where the only evidence that the court had, in a prosecution for homicide, of decedent's belief that he was going to die, was in the declaration made by him, seven days before his death, and he was not, in fact, *in extremis*, and his statement included the accusation based on hearsay that respondent fired the fatal shot, it was incompetent.

Error to the recorder's court of the city of Detroit; Phelan, J. Submitted June 12, 1914. (Docket No. 120.) Decided July 24, 1914.

[1] On the general question of the admissibility of dying declarations, see note in 56 L. R. A. 353.

Sabo Christmas was convicted of murder. Reversed.

*Watson, Safford & Shepherd,* for respondent.

*Grant Fellows,* Attorney General, *Allan H. Frazer,* Prosecuting Attorney, and *Harry B. Keidan,* Assistant Prosecuting Attorney, for the people.

BROOKE, J. Respondent stands convicted of the crime of murder. The record discloses the following facts: On the afternoon and evening of July 13, 1913, a christening party was held at the home of George Peskari in the city of Detroit. About 30 or 40 people were present. The celebration, which included drinking and dancing, lasted from 4 or 5 o'clock in the afternoon until nearly midnight. The respondent and one Julian Cadarean were guests at this entertainment. During the evening one or more disputes arose in the room where the dancing occurred, induced, it would appear, by too liberal an indulgence in intoxicating liquor on the part of the guests, and perhaps further incited by jealousy. Immediately after the last quarrel, about 11:30 p. m., Cadarean was shot by some one of the guests present. It was apparent that the shot had been fired within 10 inches of the body. Cadarean was taken to the hospital, and for a number of days hope was entertained of his recovery. The wound, however, became septic, and he died July 22, 1913, nine days after receiving his wound. Respondent was arrested and convicted.

In the course of the trial the following proceedings were had:

"George Donaldson, a witness being sworn on behalf of the people, testified as follows:
"*By Mr. Keidan:* I am a stenographer in the circuit court of this county. I have been attached to the circuit court about 12 or 14 years.
"*Mr. Wilson:* We will admit his competency.

"I took a statement of one Julian Cadarean at St. Mary's Hospital on July 15, 1913, in the presence of Assistant Prosecutor Arthur Kilpatrick, Officer Charles C. Carmody, Dr. W. C. Edmonson, and myself. I took down the statement that was made there; the questions being asked by Mr. Kilpatrick, and the answers being given by Julian Cadarean. I transcribed that statement. That is the statement there.

"*Mr. Keidan:* I am going to offer this statement as the dying statement.

"*Mr. Wilson:* I object to its introduction until it is proved to have been.

"*The Court:* You will have to go on and show first (paper marked Exhibit 3).

"*A.* This Exhibit 3 is a transcript of that statement.

"*Q.* Now, will you read the statement, the questions, and answers?

"*Mr. Wilson:* I object.

"*Mr. Keidan:* I want to say now that the statement itself will show that it is a dying statement.

"*Mr. Wilson:* I think that is a law question that should be discussed with the court before given to the jury.

"*The Court:* No, I will pass it.

"*Mr. Wilson:* I think the jury should be excused until it is determined whether it should be admitted or not.

"*The Court:* Let me have it first, Mr. Donaldson. I am not going to excuse the jury. (Paper handed to court.)

"*The Court:* It is admissible. Proceed. (Exception for defendant.)

"*Q.* Will you please read it?

"*A.* Julius Cadarean. (Statement taken at St. Mary's Hospital on Tuesday evening, July 15th, 1913, at about 9 o'clock. Present, Assistant Prosecutor Arthur Kilpatrick, Officer Charles Carmody, Dr. W. C. Edmonson, and stenographer George Donaldson.)

"Examined by Mr. Kilpatrick:

"*Q.* Do you know that you are in pretty bad shape? The doctor doesn't think you are going to get better.

"*A.* He don't?

"*Q.* The doctor doesn't think you are going to get

better. Do you know you are in pretty bad shape; that you are liable to die? Do you know you are in pretty bad shape? The doctor says you are not likely to get better. In fact you are going to die. Do you know that?

"*A.* (The witness nods his head, 'Yes.')

"*Q.* I want you to tell us before you do die—we hope you will get better, but it looks as if you would not—we want you to tell us who did the shooting. Who was it, Julius, fired that shot?

"*A.* That Saba.

"*Q.* Saba?

"*A.* Yes.

"*Q.* Saba Christmas?

"*A.* Yes.

"*Q.* Did you have some trouble with Saba before this?

"*A.* Yes.

"*Q.* The same night?

"*A.* Same night.

"*Q.* How long before he fired the shot?

"*A.* Half an hour.

"*Q.* What was the trouble about?

"*A.* There was trouble with a girl.

"*Q.* With the girl?

"*A.* Yes.

"*Q.* What girl was that?

"*A.* She is out. She was arrested. She came out.

"*Q.* That is Juliana Berch?

"*A.* Yes.

"*Q.* Is that her name?

"*A.* Yes.

"*Q.* You had trouble with him over her?

"*A.* Yes.

"*Q.* Did you strike him?

"*A.* No. He asked her if she wants to dance with him, and she says, 'No.' He says, 'Why?' She says, 'I don't want to.' Then he came to me and says, 'I'll show you if she is going to dance with you.'

"*Q.* Was Saba there all the evening?

"*A.* Yes, all the evening.

"*Q.* He came there about what time, do you remember?

"*A.* About 3 o'clock.

"*Q.* About 3 or 4 o'clock?
"*A.* Yes.
"*Q.* Are you sure he was there that early?
"*A.* Yes.
"*Q.* Did you have any trouble with Nick Paduro?
"*A.* Yes, I had with him, too.
"*Q.* That was along about 6 o'clock, wasn't it?
"*A.* Yes.   He was drunk.
"*Q.* That was over the girl, too, wasn't it?
"*A.* Yes.
"*Q.* Did Nick go home after that, do you know?
"*A.* Who?
"*Q.* Did Nick Paduro go home after you had that trouble with him?
"*A.* No, he was out.
"*Q.* Was he there?
"*A.* He was outside.   That trouble was inside.
"*Q.* He was outside at the time Saba shot you?
"*A.* Yes.
"*Q.* Did you have any trouble with—what is that man's name that runs that house?   What is his name at 157 Wight?
"*A.* I don't know.
"*Q.* Did you have any trouble with him, with the boss of that house?
"*A.* I don't know who is the boss.
"*Q.* You don't know who was the boss?
"*A.* No.
"*Q.* Did anybody just before the shooting, order you out of the house, tell you to go out?
"*A.* Yes.
"*Q.* Who was that?
"*A.* I think that was the boss.
"*Q.* You think that was the boss?
"*A.* Yes, big fellows.
"*Q.* He was a fellow with a black mustache?
"*A.* Yes.
"*Q.* Did he have a black mustache?
"*A.* Yes.
"*Q.* He told you to go out?
"*A.* Yes.
"*Q.* Why did he tell you to go out?
"*A.* Because I started trouble with Saba.
"*Q.* With Saba?
"*A.* Yes.

"*Q.* When you had this trouble—by the way, this girl was not there when he shot you, was she?

"*A.* No, that girl was not. That girl was dancing with somebody else.

"*Q.* But Juliana Berch, she was home? She had gone home?

"*A.* Yes.

"*Q.* It was another girl that you had the trouble?

"*A.* Yes, Mary.

"*Q.* That is Mary Merch?

"*A.* Yes.

"*Q.* After this fellow told you to get out of the house, did he strike you with anything or hit you?

"*A.* Yes, he knock me in the head with a piece of plank; what was it? and Saba—

"*Q.* Why did Saba have the gun?

"*A.* ———— had the gun before and he gave it to him.

"*Q.* Who had the gun?

"*A.* ———— (name not understood).

"*Q.* Little Dan?

"*A.* Yes.

"*Q.* Little Dan had the gun?

"*A.* Yes.

"*Q.* Did you see him give it to Saba?

"*A.* Yes.

"*Q.* Do you know what Saba did with the gun after he shot you?

"*A.* I don't know. He put it in the pocket, may be. May be he throw it outside, I don't know.

"*Q.* You did not see?

"*A.* No.

"*Q.* Did he run away then?

"*A.* Then he ran away.

"*Q.* Did he come back again?

"*A.* No, did not come back again.

"*Q.* That is, you did not see him?

"*A.* No, I didn't see him because the wagon came, took me off.

"*Q.* Nick Paduro was outside, was he?

"*A.* Yes, he was outside. Policeman took him outside.

"*Q.* But he was there when the shooting took place?

"*A.* Yes.

"*Q.* Did he go away after you had the trouble about 6 o'clock?

"*A.* Yes.

"*Q.* He did, and then he came back?

"*A.* Yes, he came back.

"*Q.* He came back?

"*A.* Yes.

"*Q.* How long was he away?

"*A.* About a half hour, hour.

"*Q.* Was Saba there when you had the trouble with Nick?

"*A.* Yes, he was there.

"*Q.* Did he go with Nick?

"*A.* Yes, who?

"*Q.* Saba.

"*A.* No.  There was only two in the room.

"*Q.* I mean after this trouble, about 6 o'clock.

"*A.* Yes.  The two went away.

"*Q.* Saba went away with Nick?

"*A.* Yes.

"*Q.* How long were they gone before they came back?  How long before they came back?  How long before Saba and Nick came back?

"*A.* I don't know.  The wagon took me; I don't know whether they came back or not.

"*Q.* I mean after this trouble, about 6 o'clock. They went away, didn't they?

"*A.* Yes.

"*Q.* Then they came back?

"*A.* Yes.

"*Q.* About how long?

"*A.* Half an hour.

"*Q.* About half an hour?

"*A.* Yes.

"*Q.* Then they stayed there until the shooting?

"*A.* Yes.

"*Q.* This is the truth you are telling us?

"*A.* Yes.

"*Q.* You are telling us this realizing that you are not likely to get better?

"*A.* Yes.

"*Q.* Aren't you?  You would not, feeling that you are going to die, you would not say that Saba shot you unless he actually did, would you?

"*A.* I don't know.

"*Q.* You would not say that he shot you if he did not?

"*A.* That girl she told me.    Her mother is right here now.

"*Q.* Didn't you see Saba shoot you?'

"*A.* I see the gun.

"*Q.* You saw—

"*A.* And he had the gun, nobody else, and that girl says that Saba shoot.

"*Q.* Had you ever had any trouble with Saba before this night?

"*A.* No.

"*Q.* Is there anything else you want to say to us? Anything else you want to tell us?

"*A.* Me?

"*Q.* Yes.

"*A.* No.

"*Q.* (to Mr. Carmody).    Do you think of anything else you want to ask him?

"*By Mr. Carmody:    Q.* You took Julia home?

"*A.* Yes.

"*Q.* When you took her home did Saba say to you that he will get even with you for that?

"*A.* Yes.

"*Q.* He said that, did he?

"*A.* Yes.    I took her home; I came back again.

"*Q.* He said he would get even with you for that?

"*A.* Yes.

"*Q.* You had some trouble in the afternoon with Nick Paduro?

"*A.* Yes.

"*Q.* What time was it that you had trouble with Nick?

"*A.* Six o'clock.

"*By Mr. Kilpatrick:    Q.* That was over Julia, wasn't it?

"*A.* Yes.    Julia was in there when I had the trouble with Paduro.

"*Q.* Was it because she would not dance with him?

"*A.* Yes.    She told me:    'I want to go home; I don't want to have no trouble.'    I says, 'All right.'    I took her home.

"*By Mr. Carmody:    Q.* Did Nick say at that time that he would get even with you?

181 Mich.—41.

"*A.* Yes.

"*Q.* Nick Paduro?

"*A.* Yes.

"*Q.* In the afternoon about 6 o'clock?

"*A.* Yes.

"*Q.* He said he would get even with you?

"*A.* Yes.

"*Q.* That is what you told me the other day.

"*A.* Yes, but he was outside at that time.

"*Q.* He was out at that time?

"*A.* Yes. Policeman take him out of that. He didn't have to go in no more. 'If I find you in I arrest you.'

"*Q.* Were Giga and Pete there at the time of the shooting, the barbers?

"*A.* No, I don't think; I think he was home. Giga was there.

"*Q.* Giga was there at the time of the shooting?

"*A.* Yes.

"*Q.* (to Mr. Kilpatrick). He told me the first day that Giga and Pete knew who shot him. (To the witness.) Isn't that what you told me; that Giga and Pete knew who shot you?

"*A.* Pete was home, I guess. Just Giga was there.

"*Q.* Giga was there?

"*A.* Yes.

"*By Mr. Kilpatrick: Q.* You did see the gun?

"*A.* I see the gun when he gave it to Saba. I didn't see Saba shoot. Of course the girl told me that she see when he shot.

"*Q.* But you saw the gun handed to Saba?

"*A.* Yes.

"*Q.* You saw Dan hand Saba the gun?

"*A.* Yes.

"*By Mr. Carmody: Q.* Did you drop at that time when you were shot or did you walk out into the street? Did you drop when you were shot?

"*A.* No.

"*Q.* You went out into the street, did you?

"*A.* Yes, I went out, I go myself upstairs on the bed.

"*Q.* On the bed?

"*A.* Yes, and the policeman came up.

"*Mr. Wilson:* At this time I move that the entire

statement be stricken out as being confessedly based upon hearsay evidence, being testimony that the witness himself could not have given if he had been in court; that it is prejudiced. And we make a motion at this time that this trial be declared a mistrial. The defendant has been irreparably prejudiced by the reading of that statement.

"*The Court:* I will leave it stand. Any question you wish to ask Mr. Donaldson? He has got to get back to his court? Ask him if you want him, or else excuse him.

"*Mr. Wilson:* Are you through with him? That is all.

"*Mr. Keidan:* The statement is offered in evidence.

"*The Court:* It may be accepted.

"*Mr. Wilson:* Does the former objection apply to that, the objection and exception?"

After the foregoing alleged dying declaration was received in evidence, the prosecuting attorney moved the court as follows:

"*Mr. Keidan:* That is all, your honor. At this time, if your honor please, I would like to make a motion to strike from the dying statement that was admitted in evidence here the other day, the following answer or part of answer on page 7, the fourth line, the sentence, 'That girl she told me.'

"*The Court:* What:

"*Mr. Keidan:* 'That girl she told me.'

"*The Court:* 'That girl she told me.' Is that the language of the deceased prior to his death in the hospital?

"*Mr. Keidan:* Yes, your honor.

"*The Court:* Very well.

"*Mr. Keidan:* And also in line 8, 'and that girl says that Saba shot;' two words of that are in line 9. That this be stricken out.

"*The Court:* It may be.

"*Mr. Keidan:* That is all. We rest.

"*Mr. Wilson:* At this time I desire to move that the entire dying declaration be stricken out for the reason that it was not made under the fear of impending death; the testimony of Dr. Walker being that this man was not in danger of death until two days

prior to his death.   This was taken about 10 days before his death.   I call your honor's attention in this behalf to this dialogue which took place between the prosecutor and the deceased:   'Do you know you are in pretty bad shape; the doctor does not think you are going to get better.'   To that, if your honor please, the deceased replied in the form of a question, 'A. He don't?' as Mr. Donaldson has it there.   I wish further to call your honor's attention to the fact that in a dying declaration it is supposed that a man under fear of impending death, that his mind is swept from all hatred and all prejudice, and that he will tell the truth.

"*The Court:*   It is supposed that he will tell the truth; whether his mind is clear of prejudice or all hatred is another matter.

"*Mr. Wilson:*   And that it is fear of death which takes the place of the sanctity of an oath.

"*The Court:*   Not that it is fear of death altogether, but that he will meet his Creator—

"*Mr. Wilson:*   Yes.

"*The Court:*   That he will not be likely to tell an untruth.   But I have read his statement myself very carefully, and I have pointed out some things there that I do not think should stand.

"*Mr. Wilson:*   I have one other thing.   The prosecutor asked this question, and your honor, I am reading this for the purpose of showing that if this statement itself shows that he feared impending death, and the fact that he was going to meet his Creator did not put the obligation on him to tell the truth, that is not a proper dying declaration.   The question was:   'Q. You are telling us this, realizing you are not likely to get better?   A. Yes.   Q. Aren't you, or you would not, feeling that you were going to die, and you would not say that Saba shot you unless he actually did, would you?'   His answer to that was, 'A. I don't know.'   I think, if your honor please, if a witness was on the stand and you asked him whether he knows whether he was going to tell the truth or not, and he said he didn't know, that your honor would remove him from the stand at once.

"*The Court:*   No, I could not do that; I could not remove him because, if he said he did not know

whether he was going to tell the truth or not, then
the weight of his statement would be for the jury,
and if they were not true, then the prosecuting at-
torney knows what he should do. Please let me take
that a moment.

"*Mr. Keidan:* There are several matters involved
in that question, your honor.

"*The Court:* Yes, I understand.

"*Mr. Wilson:* The bottom page 6.

"*The Court:* I allowed it to go in on this. Here
is why I allowed it go in:

" '*By Mr. Kilpatrick:* Do you know you are in
pretty bad shape; the doctor does not think you are
going to get better. *A.* He don't? *Q.* The doctor
does not think you are going to get better. Do you
know you are in pretty bad shape, that you are liable
to die, do you know that you are in pretty bad shape,
in fact you are going to die, do you know that? *A.*
(The witness nods his head, Yes.)'

"*Mr. Wilson:* If your honor please there is noth-
ing there showing fear of impending death. We all
have to die. Doesn't show anything as to when he is
going to die, and the doctor testified at that particu-
lar time there was no danger of his death; he was
getting along well until two days before his decease.

"*The Court:* '*Q.* I want you to tell us before you
die. We hope you will get better, but it looks as if
you would not. We want you to tell us who did the
shooting, who was it, Julius, fired that shot?'

"*Mr. Wilson:* If your honor please the only per-
son who was afraid that this man was not going to
get better was Mr. Kilpatrick.

"*The Court:* I believe on the whole, from the
statement, the deceased was impressed with the fact
that he was going to die from these injuries, that is
my judgment from reading the statement; that is why
I allowed the prosecutor to enter it as evidence.

"*Mr. Wilson:* There is a further motion, if your
honor please, and that is that the jury be instructed
to disregard it, and that it be stricken from the
record, each and every part of that statement which
alleges that Sabo Christmas shot the deceased; that
Sabo Christmas, the defendant, shot the deceased,
as being nothing more or less than hearsay; the wit-

ness from whom he received the information being here in court, and that he testified.

"*The Court:* No, I will allow it to stand.

"*Mr. Wilson:* Give me an exception."

Of the 79 assignments of error relied upon by respondent for reversal, we find it necessary to consider only those relating to the foregoing matter.

This declaration was taken on Tuesday evening, July 15th, less than 48 hours after Cadarean received his wound, and he lived seven days thereafter. The evidence of the physicians tends to show that hopes were entertained of his recovery up to within two or three days of his death. It is elementary that before a statement made by the deceased shall be received as his dying declaration, a preliminary investigation shall be made by the court to determine its admissibility as such. Through this investigation the court must be satisfied that the declarant was in fact *in extremis* at the time the declaration was made, and that he made it under a sense of impending death. See 2 Wigmore on Evidence, § 1451 and cases cited; 4 Encyclopedia of Evidence, p. 947, and cases cited. This court has held that it is proper to allow evidence as to the circumstances under which the dying declaration was taken to show whether it was really taken when the declarant was under the conviction of approaching and inevitable death, and evidence of this should usually be given in advance of proof of the declaration itself. *People* v. *Knapp,* 26 Mich. 112; *Hurd* v. *People,* 25 Mich. 405. See, also, *Smith* v. *State,* 9 Humph. (Tenn.) 9.

It is apparent from the proceedings quoted above that the only evidence the court had of the fact that the declaration was made by Cadarean under circumstances entitling it to admission was such as was afforded by the declaration itself. A careful analysis of this paper in our opinion falls far short of establishing

the fact that at the time of Cadarean's examination he believed himself to be dying. He was not in fact *in extremis* at the time, but lived for seven days thereafter. Aside from this infirmity, it is apparent that he had no personal knowledge as to who fired the shot which ultimately caused his death. His statement that the respondent did so was based entirely upon what some one else had told him. The error of the court in admitting the statement was not corrected when on motion of the prosecutor two statements of Cadarean were sticken from the statement, "That girl she told me," and, "That girl says that Saba shot." The statement if admissible at all should have been admitted in its entirety. *People v. Knapp, supra,* and cases cited.

Other assignments of error relative to the admission and exclusion of evidence and to the charge of the court are argued. In our opinion it is not necessary to consider them, as they are unlikely to arise on a new trial.

For the error pointed out, the judgment is reversed and a new trial ordered.

McAlvay, C. J., and Kuhn, Stone, Ostrander, Bird, Moore, and Steere, JJ., concurred.