PEOPLE *v.* KENNAN.

1. INDICTMENT AND INFORMATION—APPEAL AND ERROR—WAIVER.
  Objection to form of an amended indictment, filed several
    months after grand jury had ceased to exist, *held*, waived,
    where made for first time in brief on appeal, indictment was
    signed by the prosecutor and gives full details as to charges
    against appellant.

2. SAME—AMENDMENT.
  Amended indictment *held*, proper under statute of amendments
    where it was made on motion duly made and granted by the
    court and it did not charge a crime different from offense set
    out in the original but merely omitted some of the grounds
    underlying the charge (3 Comp. Laws 1929, § 17290).

3. CRIMINAL LAW—WITNESSES—INDORSEMENT OF INDICTMENT.
  When one is charged with aiding and abetting a criminal, it lies
    within the sound discretion of the prosecution to refuse to in-
    dorse name of the criminal as a witness.

4. SAME—INDORSEMENT OF INDICTMENT—RES GESTÆ WITNESS.
  In prosecution of real estate operator charged with aiding and
    abetting in embezzlement, abstraction and wilful misapplica-
    tion of bank's funds, prosecutor's refusal to indorse as *res
    gestæ* witness the name of the principal, a bank vice-president
    who had pleaded guilty to one count of joint indictment, *held*,
    not error, it being a matter within discretion of prosecution.

5. BANKS AND BANKING—ABSTRACTION—WILFUL MISAPPLICATION OF
  FUNDS.
  On appeal from conviction of real estate operator as one who
    aided and abetted vice-president of bank in charge of its real
    estate and mortgage department in abstraction and wilful mis-
    application of its funds, record *held*, without evidence showing
    appellant's knowledge of, or any participation in, the wrong-
    ful act involved in real estate transaction constituting the
    basis for the charge.

6. CRIMINAL LAW—INTENT—OTHER OFFENSES—EVIDENCE.

"Intent items" as set forth in bill of particulars in prosecution
for embezzlement, abstraction and wilful misapplication of
funds from bank *held,* permissible under statute, but insuffi-
cient, to prove alleged criminal intent in particular transac-
tion constituting basis for the charge (3 Comp. Laws 1929,
§ 17320).

Appeal from Recorder's Court of Detroit, Cotter
(Thomas M.), J. Submitted January 16, 1936.
(Docket No. 113, Calendar No. 37,695.) Decided
April 7, 1936.

Charles M. Kennan was convicted of aiding and
abetting the abstraction and wilful misapplication
of funds from a bank. Reversed and new trial
granted.

*Charles M. Kennan, in pro. per.*

*David H. Crowley,* Attorney General, and *Ed-
mund E. Shepherd* and *Chester P. O'Hara,* Assist-
ants Attorney General, for the people.

BUTZEL, J. On May 25, 1932, a grand jury re-
turned an indictment, not set forth in the record,
against Oscar L. Green and appellant Charles M.
Kennan. On June 5, 1933, an amended indictment
was filed by the prosecutor charging Kennan with
aiding and abetting Green in the embezzlement, ab-
straction and misapplication of $4,500 of the funds
of the American State Bank in connection with what
is hereinafter referred to as the Willys transaction.
On May 22, 1933, Green withdrew his former plea
and entered one of guilty of the charge contained in
the sixth count of the original joint indictment. Al-
though the amended indictment purports to be that
of the grand jury, it was filed several months after

the jury had been discharged and the law under which it was called had been repealed by the legislature. At the trial, upon the conclusion of the testimony and under the charge of the court, the jury was instructed to consider only counts three and five of the indictment. Count three charges aiding and abetting in the abstraction and count five in the misapplication of $4,500 of the bank's funds and property arising out of the so-called Willys transaction. Kennan was convicted and sentenced to a term of 3½ to 20 years, a part of which he has already served. In his appeal, he appears *in propria persona* and has filed his own brief together with a bill of exceptions. Both are very crude in form, but we take occasion to commend the action of the assistant attorney general in assisting the court not only in presenting the State's side of the case, but also in the fairest manner that of appellant so that we can overlook the many technical deficiencies in appellant's presentation of his claims of error.

Appellant contends that he was not convicted on any proper indictment. It is true that there is attached to the amended indictment a certification with only a typewritten signature of the foreman of the grand jury. Although it is dated May 25, 1932, it was filed much later and several months after the grand jury ceased to exist. It, however, is signed by the prosecutor and gives full details as to the charges against appellant. The record does not show that any objection whatsoever was made to the amended indictment at the time of the trial or on the motion for a new trial or in the assignments of error. Its regularity is attacked for the first time in the brief for appellant in this court. By going so far without objections, appellant waived any right he may have had to object to the amended indictment. *In re*

*Krusiewicz,* 263 Mich. 74, 76; 3 Comp. Laws 1929, § 17290. Moreover, section 17290 provides that

"The court may at any time before, during or after the trial amend the indictment in respect to any defect, imperfection or omission in form or substance or of any variance with the evidence."

The official record on file in this court shows that a motion to amend the indictment was duly made and granted by the court. The amended indictment did not charge a crime different from the offense set out in the original, but merely omitted some of the grounds underlying the charge. The amended indictment was proper.

Error is claimed because the name of Oscar L. Green was not indorsed on the indictment as a *res gestæ* witness. *Hurd* v. *People,* 25 Mich. 405, 415; *People* v. *Grant,* 111 Mich. 346. When one is charged with aiding and abetting a criminal, it lies within the sound discretion of the prosecution to refuse to indorse the name of the criminal as a witness. *People* v. *Raider,* 256 Mich. 131, 136; *People* v. *McCullough,* 81 Mich. 25, 34. Green had not been sentenced at the time of the trial, but by his plea of guilt he acknowledged the criminality of his act. The advisability of calling Green as a witness rested with the prosecution. It may become advisable, on the one hand, in the absence of other evidence, to rely upon testimony of a principal to show that the party charged with aiding and abetting him had guilty knowledge of the criminal act. On the other hand, the testimony of a self-avowed criminal might be so wholly untrustworthy as to make it inadvisable to call him to the witness stand. At any rate, the prosecution in the instant case acted within its

"sound discretion" in refusing to indorse Green's name as a witness.

Of the many other questions raised by appellant, the only one of merit is whether the verdict was against the great weight of the testimony. Although this question is not set forth in proper form, it arises out of a large number of other questions that appellant has incorporated in his brief and is discussed both by appellant and prosecution. Oscar L. Green was the vice-president in charge of the real estate and mortgage department of the American State Bank of Detroit. Kennan was a real estate dealer who was a very frequent visitor at the bank. Kennan testified that he met Green in 1926 in some business transactions and had considerable business with the bank thereafter practically all of which had been through or with Green. He was in the bank, on occasions, two and three times a day, especially when he was busy closing deals. He had approximately 30 deals with Green in about two years. Kennan adjusted land contract interests for the bank and assisted in the collection of mortgages for which he was not paid. He purchased real estate equities from Green and the customers of the bank and borrowed from the bank rather extensively. Unquestionably he was very close to Green. Appellant states that almost all his dealings with the bank were with Green, an officer of the bank and head of the mortgage department, and that he trusted Green all the time he was there. It seems quite apparent that, under such circumstances, Kennan or any other prudent person would have reason to believe that Green as vice-president of the bank had considerable power and authority. The Willys transaction upon which the indictment is founded occurred as follows: John and Katherine Willy were purchas-

ing on land contract from one Edgar B. Whitcomb property on Fern avenue in the city of Detroit, improved with a duplex and garage. The purchase price was $13,000 and payments had been made so as to reduce the balance to approximately $4,500 in 1927. In that year, a farm in Sanilac county, which they had mortgaged to the First National Bank of Yale, Michigan, was foreclosed and the bank of Yale obtained a deficiency decree against them for approximately $2,000. They settled the decree by turning over to the bank the Whitcomb contract for the purchase of the Fern avenue property. The bank in turn gave them a new contract in which the consideration was placed at the amount they still owed Whitcomb, plus the amount of the deficiency, totaling $6,517.30. The bank thus became the assignee and vendee of the original Whitcomb contract, and vendor on a subcontract for the sale of the property to the Willys for an amount equal to that due Whitcomb plus the amount of the deficiency decree due the bank. During the spring of 1930, the cashier of the bank, who had met Kennan in other business transactions, told him of the situation and stated that if the bank could obtain an amount equal to one-half of its interest in the contract, which was approximately $1,800, it would pay Kennan the other one-half as a commission. Kennan contacted the Willys and exerted considerable pressure on them to mortgage their interest in the property and pay off their indebtedness under the sub-land contract. Although unwilling at first, the Willys finally went to the American State Bank and executed a mortgage for $4,500. The method in which this mortgage loan was obtained is the gravamen of the crime of which Kennan is charged with aiding and abetting. Green advised Kennan that he

thought the American State Bank would loan the Willys a sum sufficiently large so that the Willys could pay off the bank of Yale and thus make possible immediate payment of Kennan's 50 per cent. commission. Green was the business adviser for one Mary Lou Bird, a depositor and stockholder of the American State Bank. Miss Bird had absolute confidence in Green's integrity. He had her sign a blank document. When later on he filled it in, it was an application by Miss Bird for a mortgage of $4,200 on the Fern avenue property in which she had no interest. The appraiser for the bank viewed the premises and first valued it at $7,000, but subsequently at the request of Green, raised the appraisal to $9,000. He stated at the time of the trial that the property was worth $9,000. The fact that Miss Bird was a stockholder and depositor of the bank undoubtedly entered into the committee's approval of the application and the authorization of a $4,200 loan. Green, without authority and unknown to the committee, then raised the figure from $4,200 to $4,500 and the mortgage for $4,500 was subsequently executed by the Willys and this sum was paid out by the bank. Kennan's testimony was uncontradicted that all but $38 of his commission from the bank of Yale was applied on a land contract in which Mary Lou Bird was the vendor. Green had authority to make short collateral loans and the Willys on the same day executed a 90-day note of $1,100 secured by a mortgage on the same property. No irregularity is claimed on account of this smaller note and mortgage. The Willys made payments from time to time on the mortgages which were subsequently assigned to the Peoples Wayne Bank of Detroit, Michigan, and where they continued to make payments, the record being somewhat indefinite as

to whether there is anything still due on the $1,100 mortgage. There is no showing that the Willys were in any way defrauded, and not benefited, by owning the property in fee subject to the mortgages instead of being purchasers on a land contract that could be foreclosed in a much shorter period. There is no showing that $4,500 was an excessive loan on the property. Although the fraud in securing Miss Bird's name on the application and the raising of the authorized loan to $4,500 may constitute abstraction or misapplication of funds on the part of Green, there is absolutely no direct showing that Kennan had anything to do with the Bird application or knew anything about it. Kennan testified that Green told him that an application for a mortgage was made. It is not unreasonable to assume that a vice-president of a bank, in charge of the mortgage department, would see to it that only proper methods would be used in obtaining a mortgage loan from the bank. In order to overcome this manifest gap in the testimony, plaintiff introduced several "intent items" set forth in a bill of particulars. These were permissible under 3 Comp. Laws 1929, § 17320, to prove Kennan's alleged criminal intent in the Willys transaction.

Green told Kennan of a land contract on which the amount due to the vendor was approximately $2,300 and purchasable at a discount of $800 or thereabouts. In this transaction, the bank paid out $2,300 and in return obtained a deed to the property. The vendor of the land contract was given $1,500 for his interest and the other $800 was turned over to Kennan who in turn again applied all but $83 on a contract for the purchase of some other property from Mary Lou Bird, the money being paid to Green as her agent. It is claimed by the people that

the bank itself was the purchaser of the vendor's interest in the land contract inasmuch as it took a deed to the property in its own name; that this indicates a criminal act as the bank was induced to overpay $800 and that Kennan must have known that Green was juggling the bank's funds; that Kennan's knowledge of this transaction is circumstantial evidence of his knowledge of the unlawful manner in which the Willys' $4,500 loan was obtained by Green.  Kennan, however, testified that the $2,300 was a loan to him and that he repaid the bank the full amount of this loan six days later; that although the deed was made to the bank, it was really only a mortgage for the loan of $2,300; that, consequently, the bank was not injured at all, but merely made a loan on good collateral, and subsequently was repaid.  This "intent item" fails in its purpose of showing that Kennan had a criminal intent in the Willys transaction.

The other "intent item" concerns a transaction involving four lots in the Belle Clan Gardens subdivision in Macomb county.  These lots belonged to the Terminal Land Company and each was mortgaged to the American State Bank for the full value of the lots and the houses thereon.  Two of the houses were badly in need of repair.  The president of the Terminal Land Company testified that the value of each parcel did not exceed the amount of the mortgage on it, so that there was no equity left and that, therefore, he executed deeds to the bank for each of the lots in accordance with a letter written to the Terminal Land Company by Green in which he agreed to release the land company from any further personal liability in consideration of the deeds.  It is undisputed that Green had no authority to authorize such a transaction.  The deeds were

first sent over in blank, but the president of the grantor insisted that the name of the American State Bank be inserted in the deeds, and this was done. Subsequently, one of the clerks of the bank erased the name of the bank from the deeds under the orders of Green and the deeds were given to Kennan. Kennan was to see if he "could get anyone to take them and pay the mortgage." There is some question as to whether the bank would not be better off having live mortgages rather than owning real estate. Kennan sold one lot to Clarence Doetsch, who made some payments of both principal and interest on the mortgages. He also caused to be inserted the name of Milo Warner in one of the other three and delivered all three to Warner, but the property did not pay and Warner returned the deeds to Kennan. Kennan made some payments on these three parcels, but finally turned the three deeds back to the bank, but in just what manner is not shown. Clarence Doetsch also returned his deed to the bank. The gross irregularity of the transaction is apparent, and, as stated in the brief for the people, shows the method in which some of the real estate transactions were carried on during the wild speculation that took place just prior to and at the beginning of the depression. Kennan denied that he knew that Green accepted the deeds from the Terminal Land Company and erased the name of the bank, all without authority from the board of directors. This is the most serious charge of any made against Kennan, but it is not sufficient to show that he had a criminal intent in the Willys transaction. We readily can see how a jury might have been bewildered by the maze of complicated transactions which we have but briefly outlined.

We believe, on reading the record, that there was not sufficient testimony to show that Kennan knew of the irregularity in the application for the Willys loan. The verdict was against the great weight of the evidence and for this reason the judgment is set aside and a new trial granted Kennan.

NORTH, C. J., and FEAD, WIEST, BUSHNELL, EDWARD M. SHARPE, and POTTER, JJ., concurred. TOY, J., did not sit.